IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LISA OFFORD, | ) | CASE NO.  5:21-CV-02257-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Lisa Offord ("Plaintiff" or "Offord"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.    PROCEDURAL HISTORY

In January 2020, Offord filed an application for SSI, alleging a disability onset date of January 1, 2015 and claiming she was disabled due to bipolar disorder, anxiety, PTSD, premature atrial contractions, irregular heartbeat, and degenerative disc disease.  (Transcript ("Tr.") at 91, 153, 161.)  The application was denied initially and upon reconsideration, and Offord requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 91.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

On December 22, 2020, an ALJ held a hearing, during which Offord, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On January 8, 2021, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 91-102.)  The ALJ's decision became final on October 19, 2021, when the Appeals Council declined further review.  (*Id.* at 8-14.)

On November 30, 2021, Offord filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 8-9.)  Offord asserts the following assignments of error:

(1) The ALJ erred in rendering an RFC related to Ms. Offord's bilateral hand impairments that lacked the support of substantial evidence.

(2) The Administrative Law Judge erred in the evaluation of Plaintiff's mental health symptoms and related opinions from her treating psychiatrist.

(Doc. No. 8.)

## II.      EVIDENCE

### A.      Personal and Vocational Evidence

Offord was born in June 1968 and was 52 years-old at the time of her administrative hearing (Tr. 91, 100), making her a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R.§ 416.963(d).  She has at least a high school education and is able to communicate in English.  (Tr. 100.)  She has past relevant work as a fast-food worker.  (*Id.*)

### B.      Relevant Medical Evidence[2]

On February 26, 2020, Offord saw Edward Pankey, M.D., to establish care.  (*Id.* at 325-26.)  Offord reported being bipolar and having anxiety, for which she had been taking medication, although she had been out of her medication for two months.  (*Id.* at 326.)  Offord had recently left her abusive husband and was new to the area.  (*Id.*)  Offord reported a history of self-medicating with alcohol and street drugs

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

but had been off them for six months.  (*Id.*)  Offord told Dr. Pankey she was seeking counseling through CSS.  (*Id.*)  On examination, Dr. Pankey found no edema, intact sensation, motor function, and coordination, and normal gait.  (*Id.* at 330.)  Dr. Pankey restarted Offord's Seroquel and Buspar at lower doses, with the goal of titrating up to her previous dose.  (*Id.* at 332.)  Dr. Pankey noted the preference was to have these medications managed by Offord's psychiatrist, although he would provide them in the interim.  (*Id.*)

On March 11, 2020, Offord saw Kurtis Stemple, M.D., for evaluation of her back pain, neck pain, and right-hand pain.  (*Id.* at 354.)  Offord reported occasional numbness and tingling across her lower back and described her back pain as intermittent.  (*Id.*)  Offord rated her back pain as a 4/10 that day, with it being an 8/10 at its worst.  (*Id.*)  Lifting, bending, sitting, and standing aggravated her back pain, while NSAIDs and activity modification helped alleviate it.  (*Id.*)  Offord reported intermittent numbness in her right hand and that she frequently dropped things.  (*Id.*)  The pain in her right hand was mainly at the base of her thumb and Offord described the pain as continuous.  (*Id.*)  Offord rated her hand pain as a 5/10 that day, with it being a 9/10 at its worst.  (*Id.*)  Offord reported taking anti-inflammatory medications for her hand pain.  (*Id.*)  On examination, Dr. Stemple found normal gait, limited range of motion in the cervical and lumbar spine, full muscle strength, and negative Spurling's and straight leg raise tests.  (*Id.* at 356-57.)  X-rays of Offord's right hand taken that day revealed "end stage OA."  (*Id.* at 357.)  Dr. Stemple referred Offord to Dr. Biondi for surgical evaluation.  (*Id.* at 358.)

On March 23, 2020, Offord saw Julie Morig, MS, LPCC, for a mental health evaluation to restart counseling.  (*Id.* at 386.)  Offord reported that, in addition to counseling, she needed someone to monitor her medication and medication compliance.  (*Id.*)  Offord told Morig she had diagnoses of bipolar disorder, anxiety, and PTSD.  (*Id.*)  Offord reported a past addiction to cocaine, but she had been sober since 2015.  (*Id.* at 387.)  Offord told Morig her anxiety prohibited her from being around too many

people, she was "kind of depressed" at that time, she had racing thoughts, she got manic sometimes, she had sleep problems, and she had cut herself in the past when she felt "completely overwhelmed."  (*Id.*) On examination, Morig found a pleasant demeanor, full affect, unremarkable thought content, mood, speech, and perception, unremarkable memory impairment and orientation impairment, and fair judgment. (*Id.* at 389-90.)  Morig diagnosed Offord with unspecified mood disorder, unspecified anxiety, and cocaine use disorder, severe, in sustained remission.  (*Id.* at 390.)

On April 2, 2020, Offord saw Dr. Pankey for follow up regarding chest pain.  (*Id.* at 496-97.) Offord reported talking to her counselor over the phone once a week, although she had still not seen a psychiatrist.  (*Id.* at 497.)  Offord told Dr. Pankey her anxiety had improved, although it was still there, and while Seroquel helped, she was not sleeping well.  (*Id.*)  Offord asked Dr. Pankey to increase her medications to her previous doses.  (*Id.*)  Dr. Pankey increased Offord's Seroqeul and Buspar, directed her to continue her weekly counseling sessions, and encouraged her to schedule a telehealth psychiatric appointment.  (*Id.* at 501.)

On April 20, 2020, Offord had a new patient telehealth visit with psychiatrist Sheila Paul, D.O. (*Id.* at 397.)  Dr. Paul noted Offord had been seen there in 2011 but had not received treatment there since. (*Id.*)  Offord reported her current medications kept her mood stable.  (*Id.*)  While she had increased anxiety in crowds and felt she had been more depressed, she thought it was because of the coronavirus pandemic.  (*Id.*)  Overall, Offord thought she was stable.  (*Id.*)  On examination, Dr. Paul found fair judgment and insight, mild depression and anxiety, moderate anger, clear speech, intact thought process, normal thought content, and normal perception.  (*Id.* at 400.)

On May 26, 2020, Offord had a follow-up telehealth appointment with Dr. Paul.  (*Id.* at 401.) Offord reported medication compliance and that her medication was working.  (*Id.*)  Offord told Dr. Paul she had "occasional mild depression that might last 1 day," and although three to four weeks earlier she

had a "significant bout of depression," she felt fine now.  (*Id.*)  Offord complained of "significant anxiety" and that she could not take public transportation.  (*Id.*)  Offord told Dr. Paul she got panic attacks two to three times a month.  (*Id.*)  However, Offord experienced fewer manic episodes, decreased racing thoughts, and better sleep on her current medication regimen.  (*Id.*)  On examination, Dr. Paul found fair judgment and insight, mild depression and anxiety, clear speech, intact thought process, normal thought content, and normal perception.  (*Id.* at 405-06.)  Dr. Paul continued Offord's medications.  (*Id.* at 406.)

On June 8, 2020, Offord saw hand specialist John Biondi, M.D., for an evaluation of her bilateral hand pain.  (*Id.* at 429.)  Offord reported right hand pain that she described as constant and aching and that was worse in the morning.  (*Id.*)  Offord told Dr. Biondi she had numbness and tingling in her hands, and using splints increased her pain.  (*Id.*)  Offord rated her pain as a 3/10 that day.  (*Id.*)  On examination, Dr. Biondi found CMC joint tenderness, positive Tinel's and Phalen's tests, CMC joint subluxation, and grind on the right.  (*Id.* at 431.)  On the left, Dr. Biondi found the "left thumb mp jt volar plate [was] chronically ruptured" and the thumb was "unstable" at the MP joint.  (*Id.*)  Dr. Biondi diagnosed Offord with volar plate injury of finger and arthritis of the CMC joint of the right thumb.  (*Id.* at 432.)  Offord agreed to undergo a right thumb basal joint arthroplasty.  (*Id.*)

On June 23, 2020, Offord had a follow-up telehealth visit with Dr. Paul.  (*Id.* at 465.)  Offord reported Seroquel was helping with her sleep and racing thoughts.  (*Id.*)  While Offord reported continued anxiety and depression, it was situational and because of social issues.  (*Id.*)  Offord stated she had "been feeling like 'shutting down' for the past 2 months."  (*Id.*)  Offord told Dr. Paul she napped during the day twice a week.  (*Id.*)  On examination, Dr. Paul found fair judgment and insight, mild depression and anxiety, clear speech, intact thought process, normal thought content, and normal perception.  (*Id.* at 468.)

On July 28, 2020, Offord had a follow-up telehealth visit with Dr. Paul.  (*Id.* at 470.)  Offord reported side effects from changing to Seroquel extended release, including agitation, irritability,

depression, trouble sleeping, and intrusive thoughts.  (*Id.*)  On examination, Dr. Paul found good judgment and insight, no depression, mild anxiety, full affect, clear, rapid speech, intact thought process, normal thought content, and normal perception.  (*Id.* at 473-74.)  Offord reported she wanted to continue with her current medications, although she wanted to switch back to the short-acting Seroquel as it was much better for her.  (*Id.* at 474.)  Dr. Paul noted she planned to switch back to short-acting Seroquel.  (*Id.*)

On August 7, 2020, Dr. Paul completed a mental capacity medical source statement.  (*Id.* at 578-79.)  Dr. Paul opined Offord had marked limitations in her abilities to keep social interactions free of excessive irritability or argumentation, to sustain an ordinary routine, to work a full day without interruption, and manage her psychologically based symptoms effectively.  (*Id.*)  Dr. Paul based these opinions on Offord's "extremely high" anxiety, which "could stop her working."  (*Id.* at 579.)

On August 21, 2020, Offord had a follow-up telehealth visit with Dr. Paul.  (*Id.* at 629.)  Offord reported slight depression two to three days at a time since switching to short-acting Seroquel, but stated that things were back to normal, she was feeling good, her mood had been good, and while she was still having nightmares, she was able to go back to sleep easily.  (*Id.*)  Offord agreed to restart counseling. (*Id.*)  On examination, Dr. Paul found fair judgment and insight, mild depression, mild anxiety, flat, labile affect, slurred, dysarthric speech, intact thought process, normal thought content, and auditory hallucinations.  (*Id.* at 632-33.)  Dr. Paul started Offord on Vibryd, an SSRI, so Offord could start Chantix, and prescribed Minipress for Offord's nightmares.  (*Id.* at 633.)

On September 29, 2020, Offord had a follow-up telehealth visit with Dr. Paul.  (*Id.* at 616.)  Offord reported Chantix was working well, her mood was "'fair but better,'" she had mild, intermittent depression and anxiety that "only last[ed] 2-3 days," and her nightmares had improved.  (*Id.*)  Dr. Paul noted Offord reported fair judgment and insight, mild depression and anxiety, a flat affect, clear speech, intact thought process, and normal thought content.  (*Id.* at 620.)

6

## C.     State Agency Reports

### 1.     Mental Impairments

On June 25, 2020, Karla Delcour, Ph.D., opined Offord had no limitation in her ability to understand, remember, or apply information and moderate limitations in her abilities to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself.  (*Id.* at 156.)  Dr. Delcour adopted the mental residual functional capacity found by the ALJ in the May 28, 2013 decision.  (*Id.* at 157-58.)

On August 11, 2020, on reconsideration, Cynthia Waggoner, Psy.D., affirmed Dr. Delcour's findings.  (*Id.* at 163-66.)

### 2.     Physical Impairments

On June 26, 2020, Abraham Mikalov, M.D., reviewed the record and adopted the physical RFC set forth in the May 2013 decision.  (*Id.* at 156-57.)

On August 24, 2020, on reconsideration, Leon Hughes, M.D., affirmed Dr. Mikalov's findings.  (*Id.* at 165.)

## D.     Hearing Testimony

During the December 22, 2020 hearing, Offord testified to the following:

- She lives with her parents.  (*Id.* at 113.)  She does not have a driver's license.  (*Id.* at 114.)

- The numbness and tingling she has in her hands prevent her from working.  (*Id.* at 115.)  She cannot grip anything and "constantly" drops things.  (*Id.*)  She cannot open a ketchup packet.  (*Id.*)  She has burnt herself several times trying to cook.  (*Id.* at 116.)  Her left thumb is "sloppy," and her doctor wants to put a screw in to immobilize her thumb.  (*Id.*)  If she tries to grip something with her left hand, the majority of the time she drops it.  (*Id.* at 117.)  On her right thumb she has bone spurs, which cause pain, and if she tries to grip something, she often drops it.  (*Id.*)  Her doctor recommended the same surgery she had on her left thumb, which was unsuccessful, and she is unsure that she wants to go through that surgery again and have it fail.  (*Id.* at 118.)  She is afraid to undergo the surgery.  (*Id.*)  She can hold a pencil, but it is hard for her to hold a coffee cup.  (*Id.*)  She can hold a Styrofoam cup.

7

(*Id.*)  She holds onto things with both hands because she is afraid to drop them.  (*Id.* at 118-19.)

- She gets anxious being around a lot of people.  (*Id.* at 116.)  Her heart races, she starts sweating, and she loses focus.  (*Id.*)  If she is out in public, this happens a lot. (*Id.* at 119-20.)  If she is at home, it does not happen as often, but still occurs two to three times a week.  (*Id.* at 120.)  Sometimes these episodes last for several minutes, other times they can last up to half an hour.  (*Id.*)  She takes medication for her anxiety.  (*Id.*)  The medication helps sometimes, but not always.  (*Id.*)  She sees a psychiatrist once a month.  (*Id.*)  She is looking for another counselor.  (*Id.* at 121.) She had terrible nightmares recently, so she needed to reach out to her psychiatrist in between her scheduled times.  (*Id.*)  She has a hard time staying on task and there are days when she does not leave her room or even get out of bed.  (*Id.* at 122.)  Several times a month she stays in bed for two to three days at a time.  (*Id.*)  Her mom brings her things to eat, but she has gone a couple of days without eating.  (*Id.*)  Two weeks before the hearing she had a period of almost a week where she did not feel like she could function, and she stayed in her room and only ate occasionally.  (*Id.* at 122-23.)

- The day before the hearing she woke up at 11:00 a.m., had a cup of coffee and a sandwich for breakfast, and then went back to her room and watched TV.  (*Id.* at 124.)  That day was more of a bad day and she wanted to be by herself.  (*Id.*)  She feels like being alone a couple of days a week on average.  (*Id.*)  She does have good days where she is up and down the stairs and running around the house.  (*Id.* at 124-25.)

- She does some cooking, but she is afraid to cook sometimes because she is afraid to drop the pans or get burnt.  (*Id.* at 125.)  Her mom does most of the cooking.  (*Id.*) She cleans her room but does not do any other cleaning.  (*Id.*)  She could probably dust.  (*Id.* at 126.)  She does her own laundry but does not use laundry baskets.  (*Id.*) She carries her clothes up and down the steps and puts them on hangers because it hurts to fold.  (*Id.*)  She goes to church on occasion when there are not too many people.  (*Id.*)  She does not go out to restaurants because the noise is hard for her to deal with.  (*Id.* at 127.)  She last left the house the week before the hearing to have blood work done.  (*Id.*)  Her parents take her to everything.  (*Id.*)  She occasionally goes to the store with her mom.  (*Id.* at 128.)

The ALJ told the VE he was going to use the past job as a fast-food worker from the previous decision as past relevant work.  (*Id.* at 115.)  The ALJ then posed the following hypothetical question:

> The first hypothetical, assume a hypothetical individual of the claimant's age and education with the past job that we've identified.  Further assume this individual is limited to light work with the following additional limitations [sic] handling and fingering on the right hand would be frequent, the handling on the left would be frequent, but the fingering on the left would be occasional, also frequent ramps and stairs, no ladders, ropes, or scaffolds, occasional crawl, no unprotected heights, moving mechanical

> parts or operating a motor vehicle, avoiding concentrated exposure to dust, odors, fumes, and pulmonary irritants, extreme cold and extreme heat, limited to simple routine and repetitive tasks but not at a production rate pace, simple work related decision, occasional interaction with supervisors, coworkers, and the public, few changes in a routine work setting.  Can that hypothetical individual perform that past job?

(*Id.* at 129-30.)

The VE testified the hypothetical individual would not be able to perform Offord's past work as a fast-food worker.  (*Id.* at 130.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as housekeeping cleaner, mail clerk, and office helper.  (*Id.* at 130-31.)

The AL modified the hypothetical to limit the individual to occasional handling on the left in addition to occasional fingering on the left.  (*Id.* at 131.)  The VE testified the same jobs would remain.  (*Id.*)  The ALJ asked the VE whether the jobs would remain if the individual was limited to occasional handling bilaterally.  (*Id.*)  The VE testified such a limitation would preclude all work.  (*Id.*)

### III.     STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. § 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since January 16, 2020, the application date (20 CFR 416.971 *et seq.*).

2.    There exists new and material evidence concerning the claimant's functioning, since the date of the prior administrative law judge decision.

3.    The claimant has the following severe impairments: degenerative disc disease of the cervical and lumbar spine, osteoarthritis of the right thumb, ruptured left thumb tendon, bipolar disorder, anxiety disorder, posttraumatic stress disorder [PTSD], substance abuse (20 CFR 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except with the following additional limitations.  The claimant can frequently handle objects with the bilateral upper extremities, frequently finger objects with the right hand, and occasionally finger objects with the left hand. The claimant can frequently climb ramps and stairs, and can occasionally climb ladders, ropes, and scaffolds.  The claimant cannot work at unprotected heights or near moving, mechanical parts.  The claimant cannot operate a motor vehicle. The claimant can tolerate only occasional exposure to dust, odors, fumes, and other pulmonary irritants.  The [sic] must avoid concentrated exposure to extreme

cold and extreme heat. The claimant can perform simple, routine, and repetitive tasks, but not at a production rate pace. The claimant is able to make simple, work-related decisions. The claimant can tolerate occasional interactions with supervisors, coworkers, and the public. The claimant can tolerate few changes in a routine work setting.

6.   The claimant is unable to perform any past relevant work (20 CFR 416.965).

7.   The claimant was born on June **, 1968 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

8.   The claimant has at least a high school education (20 CFR 416.964).

9.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, since January 16, 2020, the date the application was filed (20 CFR 416.920(g)).

(Tr. 94-101.)

## V.   STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings

11

are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No.

12

11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. Hand Impairments

In her first assignment of error, Offord argues the ALJ erred in finding she retained the ability to occasionally handle with her bilateral upper extremities, frequently finger with her right hand, and occasionally finger with her left hand, as these findings lack the support of substantial evidence. (Doc. No. 8 at 12.)  Offord maintains the ALJ erred in making an RFC determination "without the benefit of a medical source opinion" and the ALJ assigned little weight to the medical opinions regarding Offord's physical impairments. (*Id.* at 14.)  In addition, Offord argues the ALJ further erred in adopting the same limitations as the ALJ in the previous decision, even though "updated evidence show[ed] a worsening" of Offord's hands. (*Id.*)  Finally, Offord argues the ALJ failed to discuss a June 2020 examination by a hand specialist. (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's RFC findings regarding Offord's hand impairments. (Doc. No. 9 at 9.)  The ALJ made specific findings regarding Offord's hands, and discussed the relevant records from March and June 2020. (*Id.* at 9-10.)  By making his RFC findings, "the ALJ did not improperly assume the role of a medical expert." (*Id.* at 11.)  Finally, the Commissioner maintains the ALJ did not err in imposing the same limitations on the upper extremities where Offord "had essentially the same hand impairments in 2013 and 2021" and the record failed to

13

"show significant worsening of the hand impairments since 2013 or that additional manipulative limitations would be appropriate in 2021." (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a)(1). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing

14

*Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

With respect to Offord's hand impairments, the ALJ found as follows:

> The claimant also presents with significant arthritic complications in both of her thumbs. The claimant had undergone a left carpometacarpal arthroplasty on the left thumb in 2013 (B6F2). Recent x-rays from June 8, 2020 showed the resected trapezial bone from that operation, but no new complications (B5F10). However, the claimant appears to have suffered a rupture to the metacarpophalangeal joint in the left thumb, which has resulted in instability in that joint (B6F4-5). X-rays of the right thumb dated March 11, 2020 also showed severe carpometacarpal joint arthritis therein (B2F8). With a ruptured tendon in the left thumb and severe arthritis in the right thumb, I do find the claimant has significant limitations in her ability to lift, carry, finger, and handle. However, I note that the claimant has not exhibited any signs of muscular atrophy in the upper extremities, indicating that she has

15

> continued to use her hands and arms regularly in her daily life (B5F7).
> Again, records have shown the claimant to have normal strength, sensation,
> and reflex in the upper extremities as well (B5F7). Accordingly, I find the
> record indicates the claimant can still lift and carry at the light level, with
> restriction to frequent handling and occasional fingering, with the bilateral
> upper extremities. The claimant should also avoid more than occasional
> climbing of ladders, ropes, and scaffolds due to the significant involvement
> of the hands and fingers in such climbing. To avoid risk of serious injury to
> herself and others, I find the claimant must avoid all commercial driving,
> again due to the significant use of the hands in such activity. She should also
> avoid work near hazards as her ability to brace herself may be compromised
> because of the arthritis and tendon injuries in both thumbs.

(Tr. 98.)

To the extent Offord argues the ALJ erred by "playing doctor" because the RFC is not supported by a medical opinion, the Sixth Circuit has specifically rejected such an argument, finding "the Commissioner has final responsibility for determining an individual's RFC . . . and to require the ALJ to base her RFC finding on a physician's opinion 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'"  *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).  *See also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ.");  *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-443 (6th Cir. 2017).

The ALJ considered evidence regarding Offord's upper extremities and found the evidence warranted limitations to frequent handling bilaterally, frequent fingering on the right, and occasional fingering on the left, but no further limitations.  (Tr. 98.)  The ALJ did not err in considering this evidence.  *See Rudd*, 531 F. App'x at 728.  Nor is it error that the ALJ imposed the same limitations as the previous ALJ in 2013 when the ALJ found he was not bound by the previous ALJ determination and considered the

16

relevant record evidence regarding Offord's hand impairments. (Tr. 94, 98-100.) Contrary to Offord's argument, the ALJ's discussion of the evidence included the June 2020 appointment with the hand specialist. (*Id.* at 98.) While Offord asserts the ALJ "minimized" the severity of her hand limitations in "omit[ting] specific findings from a hand specialist's examination" (Doc. No. 8 at 15), the ALJ included positive and negative findings regarding Offord's hand impairments and recognized that she had "significant arthritic complications in both of her thumbs" and "significant limitations in her ability to lift, carry, finger, and handle." (Tr. 98.)

There is no error.

## B. Subjective Symptom Evaluation

Offord argues psychiatrist Dr. Paul's records support Offord's subjective statements regarding her mental impairments, and argues the ALJ "gave little, if any, consideration to these statements contained in Dr. Paul's treatment notes." (Doc. No. 8 at 18.) Offord asserts, "Without an analysis of Ms. Offord's statements relative to the records and opinions of Dr. Paul, the ALJ has failed to make sufficiently clear why he rejected Plaintiff's symptoms as disabling and the ALJ's failure to fully articulate his reasoning deprives this Court of the ability to conduct a meaningful review." (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's subjective symptom evaluation. (Doc. No. 9 at 12.) The ALJ considered Dr. Paul's treatment notes and accounted for Offord's subjective symptoms regarding her mental health limitations in the RFC. (*Id.* at 13-15.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how

[those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[3] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[4] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should

---

[3] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the December 22, 2020 hearing.

[4] SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

consider.[5]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Offord's testimony and other statements regarding her symptoms and limitations.  (Tr. 98-99.)  The ALJ determined Offord's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.* at 97.)  However, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision. (*Id.*)  Specifically, the ALJ found as follows:

> In terms of psychological symptoms, again the evidence of record is not fully consistent with the claimant's allegations. The claimant reports a history of symptoms that include racing thoughts, depressed moods, irritability, poor sleep due to nightmares, and traumatic flashbacks (e.g., B4F2). To some extent, the record is generally persuasive that the claimant still experiences all of these symptoms to some degree. However, the record also reflects a very long gap in mental health treatment from roughly 2012 to early 2020 (B7F5). Despite that lapse in treatment, the claimant did not and has not required intensive care for any psychologically based symptoms. The claimant reports some intermittent cutting behavior to cope with high stress levels (B7F2). But this is not a regular coping mechanism for the claimant and appears largely limited to stressful interactions with her now separated husband (B7F2). While the claimant has at times struggled to remain compliant with prescribed medications, she reports and has exhibited clear improvement in anger management, sleep quality, and levels of depression when she takes psychotropic medications as prescribed (e.g., B1F1, B4F1, B8F21). Once the claimant restarted counseling in March

---

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

2020, she also reported that such treatments were helping her cope effectively with stress (B8F21). By August 2020, the claimant reported significant improvement in her depression levels (B11F7). In a treatment note dated September 29, 2020, the claimant reported that her nightmares and sleep quality had improved, and that her depression levels were mild in nature (B12F1). This improvement had occurred with generally only one counseling session per month, being a fairly conservative schedule of treatment (B12F1). It also bears noting that the claimant's moods, social interactions, and motivation levels all appear to have improved since she removed herself from the abusive relationship she had with her husband.

With all this in mind, I find the claimant is capable of performing simple, routine, and repetitive tasks, but not at a production rate pace. Eliminating production rate pace work accounts for her reduced tolerance for stress (see B7F2). However, as the claimant presents as intelligent and able to make important decisions in her life, I find that she could consistently make simple, work-related decisions in a job setting. While the claimant has reported some irritability and anger management issues, these mostly have been isolated to her interaction with her husband (B7F2). Thus, I find that the claimant can tolerate occasional interactions with supervisors, coworkers, and the public. As a further reduction in the amount of stress and pressure the claimant would face in a typical workday, I find that the claimant can tolerate few changes in a routine work setting. Unlike the prior administrative law judge decision, I do not find the claimant would be off task ten percent of any given workday, based on this record. The file does not show any acute exacerbations of mood, and the claimant has not required any emergency treatment for mental health symptoms. The worst of the claimant's symptoms appeared to be triggered by an abusive relationship with her husband. The claimant has removed herself from that relationship and has reported noted improvements in anxiety and depression levels (B12F1).

(*Id.* at 98-99.)

The Court finds substantial evidence supports the ALJ's assessment of Offord's subjective complaints. The record evidence, as noted by the ALJ, is not entirely consistent with Offord's allegations of disabling conditions. (*Id.*) Contrary to Offord's allegations, the ALJ discussed positive and negative findings in Dr. Paul's treatment notes at Step Three and in the RFC analysis.[6] (*Id.* at 95, 98-99.) The ALJ

---

[6] While the ALJ may not have cited the same pages from Dr. Paul's treatment records as Offord cites in her brief, it is clear the ALJ considered findings both supportive and not supportive of disability in Dr. Paul's treatment notes. Contrary to Offord's arguments, the Court can trace the ALJ's reasoning in order to conduct a meaningful judicial review.

credited some of Offord's subjective symptoms but did not accept them to the extent alleged by Offord because of findings on examinations, her own statements, and lack of treatment, all factors to be considered under the regulations.  (*Id.* at 98-99.)

There is no error.

### C. Treatment of Dr. Paul's Opinion

Offord implies the ALJ erred in evaluating Dr. Paul's opinion, as the ALJ found the opinion lacked persuasiveness and consistency without discussing "much of the evidence" to which Offord cites in her brief.  (Doc. No. 8 at 18.)  The Commissioner responds substantial evidence supports the ALJ's evaluation of Dr. Paul's opinion.  (Doc. No. 9 at 15.)

Since Offord's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[7] (2) consistency;[8] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment

---

[7] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).

[8] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical

opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1); 416.920c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed the Dr. Paul's opinion as follows:

> I find little persuasive effect in the opinion of Dr. Sheila Paul D.O. who stated most notably that the claimant has marked limits in ability to keep social interactions free of excessive irritability or argumentation, to sustain an ordinary routine, to work a full day without interruption, and manage her psychologically based symptoms effectively (B9F3-4). Dr. Paul indicates her opinion is supported by a treatment relationship that goes back to 2012. However, from 2012 until March 2020, the record does not reflect much in the way of counseling for the claimant (B7F5). Thus, this opinion that dates to August 7, 2020 appears based only on a five month period since March of that year. Moreover, Dr. Paul's statements are not strongly consistent with a record that notes steady improvement in moods, depression levels, and stress tolerance with regular medicinal treatment (B12F1, B4F1). Her opinion also is not strongly consistent with the conservative nature of the treatment the claimant has received since restarting counseling in March 2020.

(Tr. 99-100.)

The ALJ went on to reject the off-task limitation in the previous decision, explaining:

> I find limited persuasive effect in the opinions of the state agency psychologists who stated the claimant is limited to low stress work, to simple tasks involving simple decision making, to occasional interactions with others, and would be off task ten percent of the workday (B3A5, B5A5). Again, I find the off task limitation of the prior administrative law judge decision is not well supported by this record, given the claimant's

23

improvements in sleep quality, depression levels, and ability to cope with stress (B12F1).

(*Id.* at 100.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.  20 C.F.R. § 416.920c(a).  Reading the opinion as a whole, it is evident to the Court the ALJ rejected Dr. Paul's findings based on conflicting evidence, including a long gap in treatment, conservative levels of medication and counseling, no hospitalizations even with a large gap in treatment, and improvement in her moods, stress tolerance, sleep quality, and depression levels as a result of treatment.  (*Id.* at 95, 98-100.)  It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here. While Offord would weigh the evidence differently, it is not for the Court to do so on appeal.  Again, while the ALJ may not have cited the same pages from Dr. Paul's treatment records as Offord cites in her brief, it is clear the ALJ considered not just the negative findings but the positive ones as well.  Contrary to Offord's arguments, the Court can trace the ALJ's reasoning in order to conduct a meaningful judicial review.

There is no error.

### VII.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: July 13, 2022                              *s/ Jonathan Greenberg*
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge